KEKER & VAN NEST, LLP
DANIEL PURCELL - #191424
AUDREY H. WALTON-HADLOCK - #250574
ALYSE D. BERTENTHAL - #253012
710 Sansome Street
San Francisco, California 94111-1704
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

ORIGINAL
FILED

AUG 2 8 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Attorneys for Plaintiff
MARLON MONGER

E-filing

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

MHP

MARLON MONGER,

CV Case No. 08    4110

Plaintiff,

**COMPLAINT FOR DAMAGES**

v.

**DEMAND FOR JURY TRIAL**

INTERNATIONAL EFFECTIVENESS
CENTER; TARYK ROUCHDY; and
MARTHA MARTINEZ,

Defendants.

421550.04

1    Plaintiff MARLON MONGER ("Monger") hereby alleges as follows:

2                          **NATURE OF THE ACTION**

3        1.      This is an employment-discrimination and wage-claim action brought under the

4    laws of the United States and the State of California.  In January 2006, defendant International

5    Effectiveness Center ("IEC"), through its founder and Chief Executive Officer Taryk Rouchdy

6    ("Rouchdy") hired Marlon Monger to provide interpretation and translation services to medical

7    patients.  Monger has AIDS.  From the beginning of his employment with IEC, Monger

8    informed Rouchdy that he required minimal, reasonable accommodations for a chronic medical

9    condition.  Rouchdy agreed to provide those accommodations and hired Monger.

10       2.      Monger was an excellent employee who consistently outperformed expectations.

11   On Monger's first day at IEC, Rouchdy was so impressed by Monger's capabilities and

12   performance that he gave Monger a 33% pay raise.  Nevertheless, Monger's supervisor Martha

13   Martinez ("Martinez") began a continuing campaign of persistent, illegal mistreatment against

14   Monger.  Martinez's general demeanor at IEC was hostile, cruel, and unprofessional, but in

15   Monger's case she went beyond general rudeness and began mistreating Monger specifically

16   because of his disability.  Martinez's abuse of Monger continued over many months and took

17   numerous forms.  Some of the most egregious examples are as follows:

18   • Shortly after he started at IEC, Martinez insisted Monger give up the
19     reasonable accommodations to his work schedule he had negotiated with
       Rouchdy.  Monger initially complied, but found that compliance worsened
20     his medical condition.  When he asked Martinez to reinstate his original
       work schedule, she refused.

21   • Martinez told Monger that he was no longer entitled to take time off work
       for medical appointments, even though those appointments were essential
22     to keep his health strong and his illness at bay.

23   • Because Monger's illness causes him periodic, intense gastrointestinal
       distress during the day, he needs to have access to and periodically use the
24     bathroom to relieve that distress.  Martinez frequently mocked Monger's
       bathroom usage in front of the entire office.  Eventually, she forbade
25     Monger from taking any breaks during his work day other than to use the
       bathroom, and instructed him he needed to tell her each time he used the
26     bathroom prior to doing so.

27   • Eventually, Monger asked Rouchdy to intervene and overrule Martinez's
       denials of reasonable accommodations as to his work schedule and ability
28     to take time to see his doctors.  Rouchdy refused to engage in a good-faith

421550.04

interactive process with Monger regarding reasonable accommodations, telling him he would have to work things out with Martinez.

- In August 2006, during a conversation about Monger's then-upcoming surgery on his right elbow, Martinez screamed at Monger, in front of the entire IEC office, that he would no longer be able to take off work for any medical appointments. When Monger asked to speak to her in private, Martinez screamed, again in front of the whole office, **"I don't care about your disability!"** Monger had not discussed the fact or extent of his disability with his peers at the office.

- Following that incident, Martinez forbade Monger from returning to work after his surgery until he recovered the full use of his right arm, even though IEC had ample work Monger could have performed that did not require the use of his right arm.

- In response, Monger filed a complaint with the San Francisco Human Rights Commission and caused that complaint to be served on IEC. IEC never responded. Instead, they began excluding Monger from the weekly work schedule, reducing his hours from roughly 35 to 40 per week to just five per week.

- Finally, in February 2007, even though IEC had a substantial amount of the very work at which Monger was proven to excel, they cited a lack of available work and terminated him.

3.    Martinez was the prime culprit in this campaign of disability discrimination and harassment, but Rouchdy was aware of, ratified, and approved Martinez's actions. Monger attempted to persuade Rouchdy to require Martinez to treat him decently, with dignity, and as the law requires, but Rouchdy consistently failed to rein in Martinez. Eventually, Rouchdy directly told Monger that he would no longer consider Monger's complaints, and that Monger had to sort out any employment issues with Martinez.

4.    Based on the above, and the additional facts disclosed below, Monger brings this suit for disability discrimination in his employment under federal and California law.

## JURISDICTION AND VENUE

5.    This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1331, because Monger asserts claims under the Americans with Disabilities Act, 42 U.S.C. §§ 12112 and 12203, and the Fair Labor Standards Act, 29 U.S.C. § 207, which are statutes of the United States. This Court further has supplemental subject-matter jurisdiction over Monger's disability-discrimination and tort claims under California law, because those claims share the same common nucleus of operative facts with Monger's federal-law claims, and are so closely related

1    to Monger's federal-law claims that all of Monger's asserted claims are part of the same case and

2    controversy.

3          6.      This Court has personal jurisdiction over IEC, which is a California business with

4    its principal location in the State of California and this judicial District.  All the events relevant

5    to this Complaint occurred during the time when Monger was employed by and performed work

6    for IEC in the State of California and this judicial District.

7          7.      This Court has personal jurisdiction over Rouchdy and Martinez, each of whom,

8    on information and belief, are citizens and residents of the State of California and this judicial

9    District, and resided and worked within the State of California and this judicial District when all

10    events relevant to this lawsuit occurred.  Moreover, all the actions taken by Rouchdy and

11    Martinez that form the basis of this Complaint were committed within the State of California and

12    this judicial District.

13          8.      Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2), because all

14    defendants to this action reside in this District and because a substantial part, if not all, of the

15    events or omissions giving rise to Monger's claims occurred in this District.

16    **<u>PARTIES</u>**

17          9.      Plaintiff Marlon Monger is, and at all relevant times mentioned in this Complaint

18    was a resident of the State of California and the City and County of San Francisco.  He was an

19    IEC employee from January 19, 2006 through February 2, 2007.

20          10.      Defendant International Effectiveness Center is an entity that transacts business in

21    and has its principal place of business in the State of California and this District, at 21 Tamal

22    Vista Boulevard, Corte Madera, CA 94925-1130.  At all dates and times relevant to this

23    Complaint, IEC maintained an office at 360 Pine Street, Suite 218, San Francisco, California

24    94104-3306, which is where Monger reported for work during his time at IEC.

25          11.      Defendant Taryk Rouchdy is IEC's owner and chief executive.  He is a resident of

26    the State of California.  At all times relevant to this Complaint, Rouchdy exercised supervision,

27    discretion, and direct control over all IEC employees, including Martinez and Monger.

28    ///

1      12.    Defendant Martha Martinez is IEC's Vice President. She is a resident of the State

2   of California. At all times relevant to this Complaint, Martinez was Monger's direct supervisor

3   at and an officer of IEC and exercised discretion and direct control over Monger's working hours

4   and responsibilities.

## FACTUAL ALLEGATIONS

### Monger's Disability

7      13.    Marlon Monger is a native of Costa Rica, who first moved to the United States in

8   1982 at age 16. When Monger first moved to the United States, he spoke only Spanish. Over

9   the course of the next several years, Monger taught himself English and obtained his General

10  Educational Development certificate. In 1995, he became a United States citizen, and, in 1996,

11  he received a Bachelor of Arts degree in French and psychology from New York University. He

12  currently speaks Spanish, French, and English fluently.

13     14.    Monger contracted the Human Immunodeficiency Virus ("HIV"), a retrovirus that

14  suppresses the human immune system, in 1998, and was diagnosed with Acquired

15  Immunodeficiency Syndrome ("AIDS") in or about 2004. AIDS is a set of symptoms resulting

16  from damage to the human immune system, commonly believed to be caused by HIV. The

17  condition progressively reduces the effectiveness of the immune system, leaving afflicted

18  individuals susceptible to, among other things, opportunistic cardiopulmonary and

19  gastrointestinal infections, tumors, and malignancies. The AIDS pandemic has killed over 2

20  million people worldwide. Although AIDS and HIV can be treated through regular use of

21  expensive anti-retroviral drugs, these treatments only can slow the course of the disease. There

22  is currently no known vaccine or cure for AIDS; a person who contracts the disorder will live

23  with it for the rest of his or her life.

24     15.    Accordingly, Monger needs to be constantly vigilant in managing his health and

25  monitoring his physical condition. Since his diagnosis, he has treated his disease through a daily

26  cocktail of anti-retroviral medication, which is essential to halt the progress of the AIDS virus

27  and to keep Monger alive and able to live a reasonably normal life. Unfortunately, the

28  medication also causes serious gastrointestinal side effects. Monger takes his medicine every

1  day on waking up, and shortly thereafter suffers acute nausea, which is frequently accompanied

2  by vomiting and/or diarrhea.  Although these effects are most acute first thing in the morning,

3  they recur throughout each day, requiring Monger to make periodic, though not necessarily

4  lengthy, trips to the bathroom and forcing him to have access to a bathroom during work hours.

5  Moreover, Monger's condition has taken its toll on his physical constitution.  In addition to

6  leaving him vulnerable to infection, AIDS leaves Monger constantly fatigued, and has caused

7  him peripheral neuropathy (i.e., numbness in extremities) and headaches.

8      16.    Monger's disability substantially limits several of his major life activities.  First, it

9  limits him in the major life activity of working.  Because Monger suffers severe gastrointestinal

10  distress several times during the work day as the course of his anti-retroviral treatment, and

11  because his condition leaves him weakened, he is significantly restricted as to the condition and

12  manner in, and duration during which he can perform a broad range of jobs in various classes,

13  which require significant physical exertion or substantial mobility, or do not permit regular

14  access to bathroom facilities.

15      17.    Second, Monger's disability limits him in the major life activity of free mobility.

16  In contrast to the average person in the general population, who is able to enjoy relatively

17  unrestricted freedom of movement during waking hours, Monger's severe gastrointestinal

18  distress forces him to remain effectively tethered to a bathroom facility at all times, preventing

19  him from spending more than one hour without ready access to such a facility.  His disability

20  also required that he regularly see a variety of medical specialists to keep track of his physical

21  condition and ward off the opportunistic infections that AIDS enables.

22      18.    Third, Monger's disability substantially limits him in the major life activity of

23  physical exertion.  Because Monger suffers severe gastrointestinal distress several times during

24  the work day as the course of his anti-retroviral treatment, and because his condition leaves him

25  weakened, he is significantly restricted as to the condition and manner in, and duration during

26  which he can exert himself physically.

27      19.    Further, as will be described in greater detail below, Monger's supervisors at IEC

28  perceived and/or treated him as physically disabled.  Although Monger's was able to fully

1   perform all his assigned duties at IEC with distinction, Monger's IEC supervisors Rouchdy and

2   Martinez perceived and/or treated him as being substantially limited in the major life activity of

3   working a general clerical office job, because of his need for regular use of bathroom facilities

4   and periodic visits to various medical professionals.  As is set forth in the paragraphs that follow,

5   Monger's employer believed and/or behaved as though Monger's disability prevented him from

6   working effectively in IEC's generic office environment.  Indeed, Monger's supervisors at IEC

7   set up numerous obstacles designed to impede Monger from performing his job duties.  Despite

8   this, Monger continued to perform his duties superlatively until his termination.

9                          **Monger's Initial Hiring by IEC**

10          20.     In January 2006, Monger responded to an IEC advertisement seeking interpreters

11  on the online job-listings site Craigslist.com.  As noted above, Monger is fluent in three

12  languages.  As of January 2006, he had approximately eight years of experience both in

13  translation—the conversion of written words from one language to another—and

14  interpretation—the conversion of spoken words from one language to another.  Specifically, he

15  had substantial experience in performing interpretation and translation for medical patients, the

16  population segment that IEC typically serves.

17          21.     Upon responding to the advertisement, Monger was called to IEC's office in San

18  Francisco for an interview with Rouchdy, IEC's founder and owner.  Rouchdy offered Monger a

19  position as an interpreter on the spot at a salary of $15 per hour.

20          22.     In response, Monger suggested that, given his experience and college degree, he

21  was overqualified to be only an interpreter.  Rouchdy agreed, but explained that he needed to

22  hire a large number of interpreters immediately because IEC had just signed a significant

23  contract with Contra Costa County to provide interpretation services to county hospitals.  Prior to

24  landing the Contra Costa County contract, IEC's business had consisted almost entirely of

25  written-translation work.  Rouchdy told Monger that Monger would start at IEC as an interpreter,

26  but would be promoted to a supervisory position shortly afterward.

27          23.     During the interview, Rouchdy told Monger that the job required him to be in the

28  office by 7:00 a.m.  Monger told Rouchdy that he had a chronic illness that required him to take

1 medication that caused severe gastrointestinal side effects, and that, as a result, he needed to be

2 at home early in the morning, when these side effects were most severe. Monger did not tell

3 Rouchdy at the initial interview that he had AIDS. After explaining his condition, Monger asked

4 Rouchdy if he could start work at 9:00 a.m. Rouchdy countered by asking if he could begin at

5 8:30 a.m., and Monger accepted the job on that condition. At the same time, Monger told

6 Rouchdy that, because of his illness, he would need to design his work schedule around frequent

7 medical appointments. Rouchdy promised Monger this would not be a problem and IEC would

8 accommodate his needs.

9     24.    Monger began work as an interpreter at IEC on or about January 19, 2006. After

10 one day of light training, Rouchdy assigned him to work on the Contra Costa County hospital

11 account. On his first day of work at IEC, Monger began taking phone calls and handling

12 interpretations. Initially, he performed all of his work over the telephone from IEC's offices in

13 San Francisco.

14     25.    It did not take long for Rouchdy to recognize that Monger excelled at his job. In

15 the morning of Monger's first day at IEC, and first day doing interpretation work, Rouchdy

16 complimented Monger's interpretation skills extensively, and spontaneously gave Monger a 33%

17 pay raise, boosting his salary from $15 per hour to $20 per hour.

18     26.    Monger quickly became known as the best interpreter and translator at IEC. He

19 received the majority of interpretation work at IEC, and also was given the most difficult

20 translation projects. He also was given responsibility for training new interpreters as they were

21 hired. For his first four or five months at IEC, he worked exclusively performing interpretation

22 work over the telephone for nurses and patients at Contra Costa County hospitals.

23     27.    IEC had more work to do in performing the Contra Costa County contract than its

24 limited staffing allowed. Rouchdy informed Monger that he had recently invested approximately

25 $250,000 in call-routing equipment, which enabled IEC to route phone calls to other numbers,

26 both inside and outside the country. At the time Monger began work at IEC, the company was

27 not using this equipment extensively, although they did use it to route calls to a few interpreters

28 who were allowed to perform work from home. After a few weeks on the job, Monger, knowing

1  that Rouchdy was hoping to hire additional workers to help perform the Contra Costa County

2  contract, suggested that this call-routing equipment could enable IEC to hire interpreters in other

3  countries. Monger told Rouchdy that he knew a number of fluent English speakers in his native

4  Costa Rica who could potentially perform interpretation work for IEC. Rouchdy suggested

5  Monger interview some of these people and, if appropriate, hire them to perform interpretation

6  work at IEC. Monger agreed, and proceeded to interview a number of interpreters in Costa Rica.

7  He kept Rouchdy informed throughout this process. On March 4, 2006, Monger wrote an e-mail

8  to Rouchdy, proposing that IEC hire a number of Costa Rican interpreters. That same day,

9  Rouchdy replied, agreeing with Monger's suggestion, specifying some of the conditions of their

10  employment, and asking Monger to hire them. Rouchdy wrote that

> 11  I would very much appreciate your help in calling the candidates. We will of
> course re-imburse you for the cost of the calls and your time.
> 12
>
> 13  I will not call them, so that we do not duplicate the work. If you can work out the
> schedules with them, and let's plan on getting them started as soon as possible.
> You can hire them, and have them email their schedules to us.
> 14
>
> 15  Once all this has been taken care of, I will call them to introduce myself, but I will
> leave the recruiting and hiring to you.

16  Monger proceeded to hire the Costa Rican interpreters, and, over the next several months, took

17  responsibility for supervising their work at IEC.

18        28.    As Monger had discussed with Rouchdy prior to his hiring, his illness forced him

19  to take time off for frequent doctor's appointments. In order to avoid causing any

20  inconvenience, Monger always notified Rouchdy or others at IEC as far in advance as possible

21  when he needed to see the doctor. He was never paid for any sick leave nor any time spent at

22  medical appointments. On several occasions, he even took calls for IEC while at the doctor's

23  office.

24        29.    During these early months working on the Contra Costa County contract, Monger

25  received only praise from Rouchdy for his work for IEC. Rouchdy never reprimanded Monger,

26  gave him negative feedback, or told him he needed to improve his work performance.

27        30.    After he had worked at IEC for about one month, Monger told Rouchdy about his

28  AIDS diagnosis—and the fact that the drugs he was taking caused severe nausea, vomiting, and

1  diarrhea, particularly in the morning—in order to explain his need to start work at 8:30 a.m. and

2  periodically to leave IEC during work hours for medical appointments. He specifically asked

3  Rouchdy to keep the information about his medical condition confidential. Rouchdy agreed, but

4  told Monger he would need to inform his second-in-command and IEC's Vice President, Martha

5  Martinez. Monger is informed and on that basis believes that Rouchdy did inform Martinez of

6  Monger's AIDS diagnosis.

7  **Conflicts with Martha Martinez**

8      31.    In her role as IEC's Vice President, Martha Martinez managed the IEC office in

9  San Francisco during Monger's tenure at the company. Prior to IEC's obtaining the Contra

10  Costa County contract, when IEC's business was overwhelmingly translation services, Martinez

11  supervised the translators at IEC. When IEC branched out into interpretation in its work for the

12  Contra Costa County hospitals, Rouchdy also assigned Martinez to supervise IEC's interpreters.

13  But in practice, during his first several months at IEC, Monger frequently received assignments

14  directly from, and reported directly to, Rouchdy, rather than Martinez.

15      32.    Martinez frequently engaged in abusive, hostile behavior in the office. She would

16  quickly become furious over insignificant things, or for no discernible reason at all. When she

17  became angry, she would scream at her subordinates, using profane, belittling language. She

18  frequently disregarded federal and California labor law and refused to permit employees to take

19  breaks during the work day. She would justify this illegal treatment on the ground that, if an

20  employee took a break, he or she might miss an incoming call. On occasions when an employee

21  would miss a call because he or she was taking a legally-mandated break, Martinez would

22  become angry, describing subordinates as "retarded," or yelling, "What the fuck am I paying

23  these people for?" Frequently, Martinez would insist employees return early from lunch or stay

24  after hours, to make up for incoming calls supposedly missed while those employees were taking

25  legally-mandated breaks. Often, she would refuse to let employees take breaks at all. Even

26  when she did permit breaks, the specter of having to stay late to make up for missed calls would

27  lead IEC employees to skip breaks to which they were legally entitled. As a direct result of

28  Martinez's unprofessional, demeaning conduct, IEC suffered substantial turnover among its

1  translators, many of whom left their positions within weeks, or even days, of being hired.

2     33.    Martinez was unfriendly to Monger from the moment Rouchdy hired Monger as

3  an interpreter.  After Rouchdy gave Monger so much autonomy in his interpretation work, and

4  supervisory power over the Costa Rican interpreters and translators, Martinez became even more

5  unfriendly and resentful toward Monger.

6     34.    Indeed, it was around the time Monger began hiring and working with the Costa

7  Rican interpreters that Martinez first began taking adverse actions against Monger.  In or about

8  March 2006, Martinez informed Monger he would need to begin coming to work at 8:00 a.m.

9  Although Monger told Martinez that it would be difficult for him to do that, he agreed to try,

10 even though Rouchdy had agreed he could come in at 8:30 a.m.  Given Martinez's generally

11 hostile demeanor and capricious acts toward subordinates, Monger was afraid that Martinez

12 might fire him if he resisted.  At the same time, Martinez told Monger that he could no longer

13 take time off work for medical appointments.

14     35.    Because Monger felt strongly that he needed, and was entitled, to leave work for

15 his medical appointments, he met with Rouchdy and raised the issue privately.  He asked

16 Rouchdy for permission to leave work for medical appointments, as he had been doing and as

17 Rouchdy had agreed he could do.  Rouchdy agreed, overruling Martinez on that point.

18     36.    With respect to Martinez's other decree, that Monger arrive each morning at 8:00

19 a.m., Monger initially attempted to comply.  In fact, Monger initially suggested that he start work

20 at 8:00 a.m. only on days when he had a doctor's appointment, before realizing that, because he

21 had appointments an average of four days per week, this "compromise" still would require him

22 to be at work at 8:00 a.m. nearly every day.  Monger continued to suffer severe gastrointestinal

23 distress each morning, which made compliance with Martinez's demands difficult for him.  He

24 continued to need medical care for this and other AIDS-related health problems, and sometimes

25 had to leave IEC during work hours in order to see his doctors.  As noted above, although

26 Monger had not disclosed to Martinez that he had AIDS or any specific condition, Monger is

27 informed and on that basis believes that Rouchdy informed Martinez of Monger's AIDS

28 diagnosis.  In any event, Martinez was aware that Monger had severe gastrointestinal problems,

1  and that his request for reasonable accommodations to his work schedule—a later start time and

2  periodic time off for medical appointments—arose from those health problems.

3      37.    IEC had no legitimate business need to require Monger to be in the office before

4  8:30 a.m.  Monger could have performed all his job duties from his home.  IEC had a system in

5  place that could route incoming calls to offsite telephone numbers, which permitted employees to

6  work from home.  Indeed, when Monger began work at IEC, IEC was using this system to permit

7  one interpreter to do work from home.  Shortly thereafter, in March 2006, IEC began using this

8  same system to permit the Costa Rican interpreters to work for IEC from outside the United

9  States.  Had Monger answered calls from home, no IEC client would have known the difference.

10  Moreover, another full-time IEC interpreter, Francisca Darling ("Darling"), arrived in the office

11  at 7:00 a.m. every weekday.  IEC's interpreters generally received an extremely small number of

12  calls (and often no calls at all) before 9:00 a.m., and Darling, and other IEC interpreters who

13  were available from their homes, easily could have handled any calls that came in before that

14  hour, without any help from Monger.  By contrast, IEC **did** have a legitimate business need for

15  Monger to stay later than 5:00 p.m.  IEC received far more calls after 5:00 p.m. than it did before

16  8:30 a.m., and in practice Monger often stayed late to respond to these calls.

17      38.    Further, IEC was more than willing to accommodate the unorthodox schedule of

18  another interpreter, Marcella Morales, who worked part-time while attending school.  IEC

19  permitted Morales to work a flexible schedule, coming to work at various times during weekday

20  afternoons, depending on her school obligations.

21                    **Monger's Request for a Reasonable Accommodation**

22      39.    Accordingly, on or about May 23, 2006, Monger wrote an e-mail to Rouchdy and

23  Martinez summarizing his concerns and making a formal request that IEC permit him to begin

24  work at 8:30 a.m. as a reasonable accommodation for his disability.  He wrote:

25          Based on the most recent conversations we've had about the request to start work
            at 8:30 am rather then [sic] 8:00 am, I have decided to write this e-mail since it is
26          difficult for me to speak about these very personal issues in person.  I'm sure we
            will work it out without a problem, but I just wanted to clarify some things
27          because, I feel that, perhaps, I have not properly conveyed the significance of my
            condition.

28

421550.04

Unfortunately, I am going through some changes in my medication which have caused a significant amount of discomfort in my life. These medicines can take two to three months to start working properly and for the body to get used to the side effects. The thing is that, apart from all the symptoms that the chronic illness causes, I also have to deal with strong side effects from these medicines daily such as strong nausea, intense fatigue, vomiting, diarrhea, headaches and others. I even take additional medicines to alleviate some of the side effects that the main medicines cause. The trick is that all these medicines must be taken on time at specific times throughout the day; some must be taken with food and some without food. Consequently, I am forced to coordinate my meals, my sleep, and even my bathroom use according to the medicines I take. All this leaves little room for changes in my daily routine.

This is why the 30 minutes makes a big difference for me in the mornings, especially right now when I am still adjusting to my new medicine. Hopefully, things will change in the future; but in any case, what I have seen so far is that my presence seems to be most needed here between the hours of 8:30 and 5:30. We never seem to have many calls at the beginning of the day, yet, I often stay late because I am stuck on a call or because Mara is running late. This would allow coverage for when she is late or answering a call.

As I had suggested, I can work Monday and Wednesdays from 8 to 5 or any other day that I might have to leave early for a doctor's appointment; and the rest of the days from 8:30 to 5:30. I don't really feel that this puts a big burden on the flow of work of the company and it does not keep from [sic] performing my job at my best, on the opposite, it makes me feel better at work.

I feel really badly having to bother you with these issues because both of you have been super nice in helping me with this situation; and I can appreciate how difficult it is to put together the business.

In order to minimize the impact of the small accommodation I requested, I try to compensate by giving you my 150%. I try to work super fast when doing translations and try to be as cordial and helpful as possible to our clients on the phone. I have been working on building a good rapport with the nurses and the people in the Financial Department who give us most of our work. I try to make them feel at ease so they enjoy their work with me and remain on the phone for long periods of time so that the company can improve the chances of earning more. As a matter of fact, I recently had 2 phone calls that lasted about 1 and ½ hours on the same day. I have also continued to receive commendations from all departments, including one today from inspector Lum from the Police Department who told me that I did my job so well that he will be requesting me specifically every time he calls. I also try to be loyal and truthful: whenever I have some information that may affect you in some way I always let you know.

Thank you very much in anticipation for your understanding and support in this matter.

Although Monger had problems with Martinez prior to May 23, and Martinez had been anything

but "super nice" to him in dealing with him generally and with respect to his disability

specifically, Monger felt he needed to bend over backwards in his approach to, and flatter,

Martinez to have any chance at all of receiving any accommodation for his disability, let alone

1    the specific accommodations he had requested.

2        40.    The next day, Monger approached Martinez to follow up on his e-mail.  Monger

3    asked Martinez to permit him to begin work at 8:30 a.m., as he and Rouchdy had originally

4    agreed.  First, Monger offered to take calls from home prior to that hour, using IEC's call-routing

5    system..  Second, Monger offered to stay at IEC's offices later in the afternoon, to make up for

6    any time missed in the morning.

7        41.    Martinez refused Monger's reasonable request, requiring him to be in the office

8    by 8:00 a.m.  Moreover, despite his continued explanation of his need to see his doctors on a

9    regular basis, Martinez continued to object to Monger taking time off to see his doctors.

10        42.    At first, feeling that Martinez would punish him if he pressed the issue, Monger

11    attempted to comply.  But after a few weeks of suffering intense distress at work, he decided to

12    raise the issue with Rouchdy in private.  During his first months at IEC, Monger had felt he

13    could talk to Rouchdy whenever Martinez was being unreasonable, and believed Rouchdy would

14    treat him fairly.  But, even after Monger pled his case to Rouchdy and explained why his

15    requested reasonable accommodations were essential to his ability to work and remain healthy,

16    Rouchdy refused to intervene.  Even worse, he informed Monger that, from then on, Rouchdy no

17    longer would handle any administrative matters and Monger needed to deal directly with

18    Martinez with respect to any employment issues.  From that point forward, Martinez would have

19    the final word with respect to Monger's employment at IEC.

### Martinez's Campaign of Disability-Based Harassment

21        43.    Martinez's mistreatment of Monger was not limited to her refusals to permit him

22    to arrive at work at 8:30 a.m. and her attempts to prevent him from attending his medical

23    appointments.  Beginning in spring 2006, Martinez engaged in a campaign of disability-based

24    harassment against Monger.

25        44.    At least two or three times a week, Martinez, or another IEC employee instructed

26    by Martinez, would knock on the bathroom door while Monger was using the bathroom, and

27    loudly demand he come out and answer a telephone call.  This had the effect of calling the entire

28    office's attention to Monger's health problems and bathroom usage on a repeated, regular basis.

1   Martinez's actions deeply embarrassed Monger and caused him profound stress, which in turn

2   aggravated his gastrointestinal issues, causing him increased pain and discomfort.

3       45.    On at least one other occasion, Rouchdy remarked, in a joking tone and in front of

4   Monger and several other IEC employees, that Monger's frequent bathroom usage meant that

5   IEC was "going to have to install a telephone in the bathroom for Marlon." This disrespectful

6   and degrading comment showed IEC's complete disregard for Monger's health problems and

7   unwillingness to reasonably accommodate those problems.

8       46.    As noted above, from the beginning of Monger's employment at IEC, Martinez

9   prevented IEC employees, including Monger, from taking legally-mandated breaks during the

10  work day. With respect to Monger specifically, Martinez told Monger that he was not permitted

11  to leave his desk to take any breaks during the work day, except to use the bathroom. She further

12  informed Monger that, before he used the bathroom, he needed specifically to inform her he was

13  planning to do so. Complying with this instruction not only was humiliating to Monger, it had

14  the effect of discouraging him from using the bathroom to relieve the severe effects of his illness

15  and informing him that IEC would not accommodate his disability.

16      47.    In or about May 2006, Martinez also told Monger that he was not permitted to use

17  his mobile phone for any purpose during work hours. Monger had never been reprimanded by

18  Martinez or anyone else at IEC for using his mobile phone during work hours, and used that

19  phone only to schedule medical appointments. Martinez's capricious refusal to permit him to

20  use his mobile phone for any purpose unreasonably interfered with Monger's ability to

21  communicate with his doctors and thus receive appropriate treatment for his chronic illness.

22                      **Loss of the Contra Costa County Contract**

23      48.    Unfortunately, Rouchdy managed the Contra Costa County contract poorly, and

24  in July 2006, IEC lost that contract. After losing the contract, Rouchdy fired all his interpreters

25  except Monger and Darling, including the Costa Rican interpreters Monger had hired. The loss

26  of the Contra Costa County contract reduced the amount of interpretation work at IEC. Monger

27  began worrying that, if IEC's business continued to decrease, he would lose his job. He spoke

28  about that possibility with Darling, who shared his concerns.

49.     At some point in July 2006, Rouchdy saw an advertisement for another interpreter job in Darling's trash can. He confronted Monger about this and asked if Monger was steering Darling toward leaving IEC. Monger told Rouchdy that neither he nor Darling wanted to leave IEC, but that both of them were concerned about the downturn in IEC's business and wondered if they were in danger of losing their jobs. After hearing Monger's response, Rouchdy calmed down and told Monger he had no reason to worry about losing his job because he was "great" at it. Shortly thereafter, because IEC had little interpretation work after losing the Contra Costa County contract, Rouchdy transitioned Monger from interpretation to translation, which had traditionally made up the bulk of IEC's business. This change in work responsibilities forced Monger to interact even more with Martinez.

50.     Despite Monger's difficulties with Martinez, and IEC's business issues, Monger continued to do excellent work. In August 2006, Rouchdy sent Monger to Oakland Children's Hospital for on-site translation work. Monger performed his work well, and at the end of his first interpretation assignment the Children's Hospital supervisor in charge of interpretation commended him enthusiastically. Further, Children's Hospital officials called IEC to commend Monger's work. The hospital subsequently requested Monger's services so often that he ended up spending 4 to 5 days there each week during August 2006.

51.     Rouchdy recognized Monger's continuing excellent work for IEC. In an August 2, 2006 e-mail, Rouchdy wrote Monger, "I am sorry about your illness and disability, and I respect your privacy. We are impressed at your handling it so well, for it must be difficult to juggle your work and medical appointments. You have always tried to make sure that your work is uninterrupted, and we appreciate it."

### "I Don't Care About Your Disability!"

52.     On or about August 6, 2006, Martinez confronted Monger in a public area at IEC and loudly demanded he tell her what medical appointments he had scheduled during her then-upcoming vacation. Monger had already sent Martinez a list with all his scheduled appointments, and told Martinez that. In an effort to head off any scheduling issues, Monger also reminded Martinez that, at the end of August, he was scheduled to have surgery on his right

COMPLAINT
CASE NO.

1  elbow, and would be absent from work for two weeks after that procedure. Martinez responded

2  angrily, telling Monger that, from that point on, he would not be able to leave work for any

3  medical appointments, and would have to see his doctors during lunch or after work. Shocked,

4  because Martinez's response had nothing to do with Monger's statement about his elbow

5  surgery, Monger asked if he could discuss the issue with Martinez privately. Monger did not

6  want to discuss these personal issues with Martinez in the middle of the IEC office.

7       53.    At that point, Martinez screamed at Monger, loud enough for the entire office to

8  hear, "**I don't care about your disability!**" She further told Monger that she didn't care about

9  his health. Martinez screamed so loudly that Rouchdy, who normally refused to get involved in

10  conflicts between Martinez and other employees, rushed out of his office and took Martinez into

11  his office to speak to her privately.

12       54.    Although Martinez and Rouchdy had called attention to, joked about, and mocked

13  Monger's bathroom usage, Monger had not expressly disclosed the specifics of his condition to

14  anyone at IEC, other than Rouchdy. As noted above, he knew that Martinez knew he had health

15  problems that required certain reasonable accommodations to his work schedule, but no more

16  than that. Monger was humiliated by Martinez's abuse and her disclosure of his disability to the

17  entire office, both without his consent and in a demeaning, dismissive fashion. He was also

18  stunned by Martinez's direct, unambiguous statement that she, his supervisor and IEC's Vice

19  President, did not care about or feel any need to accommodate his disability.

20       55.    Several minutes later, Martinez left Rouchdy's office. Now calm, she came into

21  Monger's office, shut the door, and repeated her statement that he could not schedule any more

22  doctors' appointments during work hours. Monger replied that such limitations were illegal and

23  that, if necessary, he would ask his lawyer to contact her and explain his legal rights.

24           **Monger's Elbow Surgery and Human Rights Complaint**

25       56.    On August 28, 2006, shortly before his elbow surgery, Monger wrote an e-mail to

26  Martinez and Rouchdy regarding that surgery and his planned recovery:

27      I wanted to remind you that I am having my surgery this coming Friday,
   September 1st, 2006. Although, the doctor says that I need to rest 2 to 3 weeks, I

28      am hoping that it will be only one week. He says that the recuperation time is

different for everybody and he will be happy to work with me in helping me get back to work a.s.a.p.

57.    That same day, Martinez replied:

We wish you a successful surgery and speedy recovery.  Please have your doctor provide us with a signed letter stating that you are fully recovered and capable of performing your normal duties, including working on a computer.

58.    When Monger asked Martinez to clarify the meaning of her request, she told him he could return to work only when he recovered the full use of his right arm.  This made no sense, as few of Monger's job duties required the full use of both arms.  In July and August 2006, the two months preceding his surgery, Monger performed a variety of verbal and written translation work for IEC.  During that same time period, he performed interpretations both on-site and in the IEC office.  Verbal translation, which work was readily available at IEC in 2006, would not have required Monger to use his right arm.  Similarly, on-site interpretation work was available at IEC in 2006, and that work would not have required Monger to use his right arm.  Monger believed, and continues to believe, that Martinez was imposing an arbitrary restriction on his employment in order to drive him away from IEC.

59.    On September 1, 2006, Monger had successful surgery on his elbow.  He took the next two weeks off to recover, as his doctor had advised.  By September 14, 2006, he was ready to return to work, and asked his surgeon to write a letter detailing the limits on physical activity he should abide by during his recovery.  That same day, Monger's doctor sent that letter to IEC, which letter stated, "Patient Marlon Monger may do verbal interpretation but can not do any work with right hand."

60.    On or about September 15, 2006, Monger informed Martinez that he was ready to return to work.  Also on September 15, because he was ready to return to work but feared IEC would refuse to allow him to do so pursuant to Martinez's earlier letter, Monger caused the San Francisco Human Rights Commission ("SFHRC") to send a letter to IEC on his behalf.  The SFHRC letter stated that Monger was ready to return to work subject to temporary, reasonable accommodations for his elbow.  It further detailed the slight accommodations Monger would need to continue work while recovering from surgery, and concluded by asking IEC to permit

1   Monger to return to work with such accommodations. IEC received the letter, but never offered

2   any response to Monger's request.

3                    **IEC's Campaign of Retaliation Against Monger for His Complaint**

4        61.    IEC employees' work schedules are not fixed from week to week. Instead, IEC

5   draws up a new and separate schedule each week, and a given employee's working hours and

6   responsibilities are liable to vary from week to week, depending on the work IEC has to offer

7   during that week. Accordingly, an employee who during a given week is given a particular work

8   assignment, or scheduled for more hours, cannot necessarily count on having that type or amount

9   of work in subsequent weeks. Similarly, an employee who during a given week is denied

10  assignments, or whose hours are cut, may be given additional or more desirable assignments, or

11  an increase in hours, in future weeks.

12       62.    Although Monger resumed work for IEC later in September 2006, during his first

13  week back on the job, IEC drastically cut his work hours, scheduling him for approximately five

14  hours. (Between his start date in February 2006 and the end of August 2006, Monger typically

15  had worked 35-40 hours per week for IEC.)

16       63.    Around the same time, IEC also began telling clients for whom Monger had done

17  satisfactory or outstanding work in the past that Monger was unavailable. In late September or

18  early October 2006, Monger received a call early one morning from Joanna Pacheko, then a

19  receptionist at IEC. Pacheko told Monger he was needed at Oakland Children's Hospital, where,

20  as discussed above, he had previously worked for IEC, and so successfully that his contact at the

21  hospital had repeatedly requested his services. Monger began preparing for the assignment. But

22  before he left, Pacheko called back and told Monger that the hospital had told IEC it did not want

23  Monger to do the job. Because of his history at the hospital, Monger was surprised and

24  discouraged. He called his contact at Oakland Children's Hospital and asked whether he had

25  done something wrong. His contact told him a very different story: that the hospital had asked

26  for Monger specifically, but that IEC had told the hospital that Monger was not available. In

27  other words, IEC had lied to Monger. IEC knew what was involved in interpretation work and

28  understood Monger was capable of performing on-site interpretation work despite his then-recent

421550.04

1    surgery.  Even if IEC had not known that fact, the letters from Monger's doctor and the SFHRC

2    had informed IEC of that fact.

3        64.    During fall 2006, IEC continued to schedule Monger for approximately five hours

4    worth of work.  Monger regularly told IEC he was willing and able, and preferred, to work more

5    hours than he was given.  IEC never increased his hours.  Neither did IEC ever inform Monger

6    that this reduction in his work hours was permanent.  Instead, they consistently told Monger that

7    they would contact him if more work became available, giving him the impression that he might

8    receive more hours in the future if work conditions at IEC changed.

9        65.    Monger depended financially on full-time work at IEC.  When IEC took that work

10   from him, he suffered significant financial hardship.

11       66.    On January 23, 2007, IEC sent Monger a letter, notifying him they were formally

12   terminating his employment effective February 2, 2007.  In the January 23 letter, IEC cited a

13   lack of available on-site interpretation work as the basis for Monger's termination.  Specifically,

14   the company asserted that "the low volume of telephone interpreting can no longer sustain an in-

15   house employee."  IEC's basis for terminating Monger was pretextual.  Although Monger was

16   unaware of this until March 2008, at the time he was terminated, IEC had regained the contract

17   to provide interpretation services to Contra Costa County hospitals in December 2006.  The

18   Contra Costa County Board of Supervisors approved the renewed contract on February 6, 2007.

19   After regaining that contract, IEC had ample interpretation work they could have offered to

20   Monger.  Alternatively, IEC had always had, and continued to have, ample translation work that

21   Monger also could have performed, as he often had during his time at IEC.  Despite his

22   consistently excellent performance, which both IEC and its clients had repeatedly recognized, the

23   company fired him instead.

24       67.    As it had indicated it would in its January 23, 2007 letter, IEC finally terminated

25   Monger's employment on February 2, 2007.

26               **Monger's Exhaustion of His Administrative Remedies**

27       68.    On October 29, 2007, Monger filed a complaint with the California Department of

28   Fair Housing and Employment ("DFEH").  That complaint, which Monger attaches to this

1  Complaint as Exhibit A and incorporates herein by reference, presented the following claims of

2  disability discrimination to DFEH:

- Denial of various reasonable accommodations to his conditions of employment, including his request to begin work at 8:30 a.m. and be permitted time off for periodic medical appointments.

- Reduction in work hours between his elbow surgery in September 2006 and January 2007, including, specifically, the termination of Monger's work at Oakland Children's Hospital.

- Retaliation for his assertion of his rights under California law.

- Termination of his employment in February 2007.

9  Monger specifically plead in his DFEH complaint that IEC committed these acts wholly or partly

10  because he had AIDS, which constitutes a qualifying disability per se under California law, and

11  constitutes a qualifying disability under federal law in the circumstances of this case.

12      69.      On October 31, 2007, DFEH closed its file on Monger's complaint, referring that

13  complaint to the federal Equal Employment Opportunity Commission ("EEOC") and issuing a

14  right-to-sue letter to Monger, which letter is attached to this Complaint as Exhibit B and which

15  Monger incorporates herein by reference.

16      70.      Beginning on August 7, 2008, having heard nothing from the EEOC to that date,

17  Monger, through his counsel, began requesting a right-to-sue letter from EEOC. On August 20,

18  2008, EEOC aclosed its file on Monger's complaint and issued Monger a right-to-sue letter,

19  which Monger's counsel received on August 21, 2008. That letter is attached to this Complaint

20  as Exhibit C, and Monger incorporates it herein by reference.

**IEC's Violations of Federal and California Wage Laws**

22      71.      In addition, through Monger's employment at IEC, IEC willfully established and

23  followed illegal wage practices, including non-payment of overtime wages, delayed payment of

24  wages, and denial of breaks mandated by law.

25      72.      Throughout Monger's employment, IEC failed to account for and pay Monger's

26  full overtime wages. IEC repeatedly paid Monger only his regular hourly wage for overtime

27  hours, rather than the increased wages required under both federal and California law.

28  ///

73.     As discussed in some detail above, IEC also consistently denied Monger rest and meal breaks required under the California Labor Code. As described above, Martinez routinely berated and cursed IEC's employees, including Monger, for taking any breaks at all during the work day.

74.     IEC also failed to provide Monger with complete and accurate wage statements identifying his correct hours and compensation for regular and overtime hours, and all other information required by law.

75.     On several occasions, IEC also failed to pay Monger's wages timely. Throughout fall 2006, Monger repeatedly reminded Martinez that he had not been paid for certain hours and requested payment of those back wages. Nevertheless, IEC failed to pay certain wages for Monger's work in fall 2006 until many weeks after Monger's termination in February 2007. IEC still has not paid Monger's full overtime compensation for his work at IEC, or the premiums required under California law for the breaks IEC illegally denied Monger.

## FIRST CLAIM FOR RELIEF

### Disability Discrimination under the Americans with Disabilities Act (Against IEC)

76.     Monger incorporates the preceding paragraphs by reference as though fully set forth here.

77.     As discussed above, Monger worked for IEC from January 19, 2006 to February 2, 2007 ("the Employment Period"). At all times during the Employment Period, IEC was an employer subject to the Americans with Disabilities Act ("ADA"), and Monger was an employee of IEC.

78.     As described in greater detail above, throughout the Employment Period, Monger had AIDS, which substantially limited him in his ability to perform multiple major life activities.

79.     Both Rouchdy, IEC's owner and chief executive, and Martinez, its Vice President and second-in-command, knew that Monger was disabled. Rouchdy learned that Monger was disabled during his initial interview with Monger in mid-January 2006, and learned the specific nature of Monger's AIDS disability about a month later. Martinez learned that Monger was disabled shortly after he began work at IEC, and no later than March 2006, when Monger first

1   advised her of his need for reasonable accommodations to his schedule, both to recover from his

2   morning dose of medication and for doctor's appointments.  Further, both Rouchdy and Martinez

3   treated Monger as a disabled person, for all the reasons described in this Complaint.

4       80.    Monger was able to perform all essential duties of his job at IEC with reasonable

5   accommodations to his work schedule.

6       81.    IEC consistently mistreated Monger because of his disability and his attempts to

7   enforce his rights under federal and state law.  Most obviously, when Monger returned to work

8   after his elbow surgery in September 2006, IEC repeatedly scheduled Monger for only minimal

9   hours, instead of his previous full-time schedule, although work was available.

10      82.    As discussed above, IEC employees' work schedules are not fixed from week to

11  week.  Instead, IEC draws up a new and separate schedule each week, and a given employee's

12  working hours and responsibilities are liable to vary from week to week, depending on the work

13  IEC has to offer during that week.  Accordingly, an employee who during a given week is given

14  a particular work assignment, or scheduled for a certain number of hours, may receive a different

15  type or amount of work in subsequent weeks.  Similarly, an employee who during a given week

16  is denied assignments, or whose hours are reduced, may be given additional or more desirable

17  assignments, or an increase in hours, in future weeks.

18      83.    Accordingly, each weekly work schedule created and distributed by IEC from the

19  date on which Monger was able to return to work—September 15, 2006—through the date IEC

20  terminated him—February 2, 2007—was an independent instance of disability discrimination

21  against Monger.

22      84.    IEC terminated Monger's employment on February 2, 2007.

23      85.    Monger's disability and/or IEC's belief that he was disabled was a motivating

24  reason for IEC's adverse employment actions of cutting Monger's hours and terminating

25  Monger.

26      86.    IEC's stated reasons for refusing to give Monger substantial hours and eventually

27  for terminating him were false and pretextual.

28  ///

1    87.    Monger discovered that IEC's stated reason for limiting his work hours and then

2   terminating him—the absence of interpretation work—was false only in March 2008, when he

3   learned that IEC had regained the Contra Costa County hospital contract and the associated

4   interpretation work.  In any event, IEC easily could have transitioned him to written translation

5   work, which Monger was qualified to perform and had been performing during his time at IEC.

6   IEC had sufficient available translation work to retain Monger as an employee.

7    88.    As a direct and proximate result of IEC's discriminatory conduct, Monger has

8   suffered harm including, but not limited to, loss of income and emotional distress.

9    89.    IEC's unlawful conduct was committed by Rouchdy and Martinez, officers and

10   managerial employees acting within the scope of their employment.

11    90.    IEC, Rouchdy, and Martinez intentionally violated the ADA, acting with malice

12   and/or a reckless disregard for Monger's rights.

13                        **SECOND CLAIM FOR RELIEF**

14    **Disability Discrimination under the California Fair Employment and Housing Act**

15                            **(Against IEC)**

16    91.    Monger incorporates the preceding paragraphs by reference as though fully set

17   forth here.

18    92.    As discussed above, at all times during Monger's Employment Period with IEC,

19   IEC was an employer subject to the California Fair Employment and Housing Act ("FEHA"),

20   and Monger was an employee of IEC.

21    93.    As described in greater detail above, throughout the Employment Period, Monger

22   had AIDS, which is expressly recognized under FEHA as a qualifying disability per se.

23    94.    As described in greater detail above, both Rouchdy and Martinez knew Monger

24   was disabled and treated Monger as a disabled person during the Employment Period.

25    95.    Monger was able to perform all essential duties of his job at IEC with reasonable

26   accommodations to his work schedule.

27    96.    IEC consistently mistreated Monger because of his disability and his attempts to

28   enforce his rights under federal and state law.  Most obviously, when Monger returned to work

1   after his elbow surgery in September 2006, IEC repeatedly scheduled Monger for only minimal

2   hours, instead of his previous full-time schedule, although work was available.

3       97.    As discussed above, IEC employees' work schedules are not fixed from week to

4   week. Instead, IEC draws up a new and separate schedule each week, and a given employee's

5   working hours and responsibilities are liable to vary from week to week, depending on the work

6   IEC has to offer during that week. Accordingly, an employee who during a given week is given

7   a particular work assignment, or scheduled for a certain number of hours, may receive a different

8   type or amount of work in subsequent weeks. Similarly, an employee who during a given week

9   is denied assignments, or whose hours are cut, may be given additional or more desirable

10  assignments, or an increase in hours, in future weeks.

11      98.    Accordingly, each weekly work schedule created and distributed by IEC from the

12  date on which Monger was able to return to work—September 15, 2006—through the date IEC

13  terminated him—February 2, 2007—was a separate and independent instance of disability

14  discrimination against Monger.

15      99.    Moreover, IEC's pattern of denying Monger regular, full-time work constituted a

16  continuing violation of his rights under FEHA to be free from disability discrimination. IEC's

17  wrongful denials of hours to Monger from September 2006 to February 2007 were all

18  interrelated acts that together made up an ongoing course of unlawful conduct towards Monger.

19  The wrongful denials of hours occurred regularly, each time IEC published its weekly work

20  schedule and unfairly limited Monger to an unreasonably small number of hours. And because

21  IEC never told Monger it was permanently cutting his hours, and IEC created a new schedule

22  each week, a reasonable person would not have believed that any of the individual schedules

23  constituted a final decision regarding his or her work schedule.

24      100.   IEC terminated Monger's employment on February 2, 2007.

25      101.   Monger's disability and/or IEC's belief that he was disabled was a motivating

26  reason for IEC's adverse employment actions of cutting Monger's hours and terminating

27  Monger.

28  ///

421550.04

102.    IEC's stated reasons for reducing Monger's work hours and for terminating him were false and pretextual.

103.    Monger discovered that IEC's stated reason for limiting his work hours and then terminating him—the absence of interpretation work—was false only in March 2008, when he learned that IEC had regained the Contra Costa County hospital contract and the associated interpretation work. In any event, IEC easily could have transitioned him to written translation work, which Monger was qualified to perform and had been performing during his time at IEC. IEC had sufficient available translation work to retain Monger as an employee.

104.    As a direct and proximate result of IEC's discriminatory conduct, Monger has suffered harm including, but not limited to, loss of income and emotional distress.

105.    IEC's unlawful conduct was committed by Rouchdy and Martinez, who are both IEC officers and managing agents. Rouchdy endorsed, approved, and/or ratified Martinez's unlawful conduct toward Monger.

106.    IEC's conduct was despicable and in willful and conscious disregard of Monger's rights, and IEC acted toward Monger with malice, oppression, and fraud.

## THIRD CLAIM FOR RELIEF

### Retaliation under the ADA (Against IEC)

107.    Monger incorporates the preceding paragraphs by reference as though fully set forth here.

108.    As discussed above, at all times during Monger's Employment Period with IEC, IEC was an employer subject to ADA, and Monger was an employee of IEC.

109.    As described in greater detail above, throughout the Employment Period, Monger had AIDS, which substantially limited him in his ability to perform multiple major life activities.

110.    As described in greater detail above, both Rouchdy and Martinez knew Monger was disabled and treated Monger as a disabled person during the Employment Period.

111.    Monger was able to perform all essential duties of his job at IEC with reasonable accommodations to his work schedule.

///

1    112.    Monger exercised his rights under the ADA by requesting reasonable

2  accommodations for his medical condition from IEC, by informing IEC that he believed the

3  company was not respecting his legal rights (including but not limited to his efforts to seek help

4  from the SFHRC), and by taking other actions as described above.

5    113.    IEC consistently mistreated Monger because of his disability and his attempts to

6  enforce his rights under federal and state law.  Most obviously, when Monger returned to work

7  after his elbow surgery in September 2006, IEC repeatedly scheduled Monger for only minimal

8  hours, instead of his previous full-time schedule, although work was available.

9    114.    As discussed above, IEC employees' work schedules are not fixed from week to

10  week.  Instead, IEC draws up a new and separate schedule each week, and a given employee's

11  working hours and responsibilities are liable to vary from week to week, depending on the work

12  IEC has to offer during that week.  Accordingly, an employee who during a given week is given

13  a particular work assignment, or scheduled for a certain number of hours, may receive a different

14  type or amount of work in subsequent weeks.  Similarly, an employee who during a given week

15  is denied assignments, or whose hours are cut, may be given additional or more desirable

16  assignments, or an increase in hours, in future weeks.

17    115.    Accordingly, each weekly work schedule created and distributed by IEC from the

18  date on which Monger was able to return to work—September 15, 2006—through the date IEC

19  terminated him—February 2, 2007—was an independent instance of retaliation against Monger.

20    116.    Monger's attempts to exercise his rights under the ADA were a motivating reason

21  for IEC's adverse scheduling decisions and termination of Monger.

22    117.    Defendants' stated reasons for refusing to give Monger substantial hours and for

23  terminating him were false and pretextual.

24    118.    Monger discovered that IEC's stated reason for limiting his work hours and then

25  terminating him—the absence of interpretation work—was false only in March 2008, when he

26  learned that IEC had regained the Contra Costa County hospital contract and the associated

27  interpretation work.  In any event, IEC easily could have transitioned him to written translation

28  work, which Monger was qualified to perform and had been performing during his time at IEC.

1  IEC had sufficient available translation work to retain Monger as an employee.

2      119.    As a direct and proximate result of defendants' adverse scheduling decisions and

3  termination, Monger has suffered harm including, but not limited to, loss of income and

4  emotional distress.

5      120.    IEC's unlawful conduct was committed by Rouchdy and Martinez, officers and

6  managerial employees acting within the scope of their employment.

7      121.    IEC, Rouchdy, and Martinez intentionally violated the ADA, acting with malice

8  and/or a reckless disregard for Monger's rights.

9                          **FOURTH CLAIM FOR RELIEF**

10                      **Retaliation under FEHA (Against IEC)**

11      122.    Monger incorporates the preceding paragraphs by reference as though fully set

12  forth here.

13      123.    As discussed above, at all times during Monger's Employment Period with IEC,

14  IEC was an employer subject to the California Fair Employment and Housing Act ("FEHA"),

15  and Monger was an employee of IEC.

16      124.    As described in greater detail above, throughout the Employment Period, Monger

17  had AIDS, which is expressly recognized under FEHA as a qualifying disability per se.

18      125.    As described in greater detail above, both Rouchdy and Martinez knew Monger

19  was disabled and treated Monger as a disabled person during the Employment Period.

20      126.    Monger was able to perform all essential duties of his job at IEC with reasonable

21  accommodations to his work schedule.

22      127.    Monger exercised his rights under FEHA by requesting reasonable

23  accommodations for his medical condition from IEC, by informing IEC that he believed the

24  company was not respecting his legal rights (including but not limited to his efforts to seek help

25  from the SFHRC), and by taking other actions as described above.

26      128.    IEC consistently mistreated Monger because of his disability and his attempts to

27  enforce his rights under federal and state law.

28      129.    As discussed above, IEC employees' work schedules are not fixed from week to

1  week. Instead, IEC draws up a new and separate schedule each week, and a given employee's

2  working hours and responsibilities are liable to vary from week to week, depending on the work

3  IEC has to offer during that week. Accordingly, an employee who during a given week is given

4  a particular work assignment, or scheduled for a certain number of hours, may receive a different

5  type or amount of work in subsequent weeks. Similarly, an employee who during a given week

6  is denied assignments, or whose hours are cut, may be given additional or more desirable

7  assignments, or an increase in hours, in future weeks.

8      130.    Accordingly, each weekly work schedule created and distributed by IEC from the

9  date on which Monger was able to return to work—September 15, 2006—through the date IEC

10  terminated him—February 2, 2007—was a separate and independent instance of retaliation

11  against Monger.

12      131.    Moreover, IEC's months-long pattern and practice of retaliation against Monger

13  constituted a continuing violation of his rights under FEHA. At first, when Monger requested a

14  reasonable accommodation to his work schedule from Rouchdy during his initial interview,

15  Rouchdy agreed to accommodate Monger by permitting him to arrive at work at 8:30 a.m. and to

16  take time off for medical appointments. Then, in March 2006, Martinez rescinded the reasonable

17  accommodation to Monger's schedule and insisted he begin work at 8:00 a.m. Martinez also

18  forbade Monger from taking time off to see his doctors, although Rouchdy later overruled

19  Martinez on that point. IEC began retaliating against Monger in May 2006, when Monger

20  formally requested, as the law provides, that the original reasonable accommodation Rouchdy

21  had granted him in January 2006 be reinstated. The retaliation continued through Monger's

22  ongoing dialogue with Martinez regarding his work hours and doctor's appointments, and

23  Martinez's harassment of him for his bathroom usage and denial of breaks. In August 2006,

24  Martinez again decreed that Monger could no longer take any time off for medical appointments,

25  at which point Monger again asserted his legal rights. Martinez then barred him from returning

26  to work after his surgery. In response to that, in September 2006, Monger yet again asserted his

27  legal rights, this time through SFHRC. His persistent willingness to negotiate these issues with

28  an unreasonable supervisor was met with yet more retaliation, as Martinez began crafting each

1  weekly IEC work schedule to deny Monger hours, even though work was available, before

2  eventually terminating him in February 2007.

3      132.    IEC's retaliatory actions against Monger from May 2006 through February 2007

4  were all interrelated and similar in nature; they each followed Monger's assertion of his legal

5  rights, and involved Monger's work schedule and right to take time off for medical

6  appointments.  The retaliatory acts occurred regularly and frequently, and together formed an

7  ongoing course of retaliatory conduct towards Monger.  Further, because IEC had frequently

8  changed its position on Monger's work hours and right to see his doctors during work hours,

9  either in response to Monger's assertion of his rights, Rouchdy's intervention with Martinez, or

10  Martinez changing her own mind, a reasonable person in Monger's position would not have

11  believed that any of IEC's adverse actions were final.  Indeed, Monger continued to negotiate

12  each issue with IEC until IEC terminated him, recognizing that IEC could still alter its illegal

13  practices, as it had altered its position before.

14      133.    Monger's attempts to exercise his rights under FEHA were a motivating reason

15  for IEC's adverse employment actions against Monger.

16      134.    IEC's stated reasons for refusing to reasonably accommodate Monger, for failing

17  to give Monger substantial hours, and for terminating Monger were false and pretextual.  With

18  respect to the refusal to reasonably accommodate Monger's scheduling needs and medical

19  appointments, as noted above, IEC had no legitimate business need for Monger to be in the

20  office before 8:30 a.m., and Monger repeatedly expressed his willingness to make up missed

21  time at other times of the day when IEC had more of a need for his services.

22      135.    Monger discovered that IEC's stated reason for limiting his work hours and then

23  terminating him—the absence of interpretation work—was false only in March 2008, when he

24  learned that IEC had regained the Contra Costa County hospital contract and the associated

25  interpretation work.  In any event, IEC easily could have transitioned him to written translation

26  work, which Monger was qualified to perform and had been performing during his time at IEC.

27  IEC had sufficient available translation work to retain Monger as an employee.

28  ///

1     136.   As a direct and proximate result of IEC's adverse scheduling decisions and

2    termination, Monger has suffered harm including, but not limited to, loss of income and

3    emotional distress.

4     137.   IEC's unlawful conduct was committed by Rouchdy and Martinez, who are both

5    IEC officers and managing agents.  Rouchdy endorsed, approved, and/or ratified Martinez's

6    unlawful conduct toward Monger.

7     138.   Defendants' conduct was despicable and in willful and conscious disregard of

8    Monger's rights, and defendants' acted toward Monger with malice, oppression, and fraud.

## FIFTH CLAIM FOR RELIEF

### Failure to Provide Reasonable Accommodation under the ADA (Against IEC)

11     139.   Monger incorporates the preceding paragraphs by reference as though fully set

12    forth here.

13     140.   As discussed above, at all times during Monger's Employment Period with IEC,

14    IEC was an employer subject to ADA, and Monger was an employee of IEC.

15     141.   As described in greater detail above, throughout the Employment Period, Monger

16    had AIDS, which substantially limited him in his ability to perform multiple major life activities.

17     142.   As described in greater detail above, both Rouchdy and Martinez knew Monger

18    was disabled and treated Monger as a disabled person during the Employment Period.

19     143.   Monger was able to perform all essential duties of his job at IEC with reasonable

20    accommodations to his work schedule.

21     144.   When Monger returned from his elbow surgery in September 2006, Monger asked

22    that IEC permit him to return to work with certain specified reasonable accommodations.

23    Monger caused the SFHRC to submit a formal letter to IEC asserting his legal rights and setting

24    forth specific requested reasonable accommodations.  Monger informed IEC that the

25    accommodations he requested were necessary because of his disability.  Similarly, the schedule

26    adjustments Monger requested were reasonable and would not affect his ability to fulfill the

27    essential duties of his position or interfere with IEC's business.  IEC allowed other, non-disabled

28    employees many of the reasonable accommodations Monger had requested, including flexible

421550.04

1    work schedules and/or the right to work from home.

2        145.    IEC never responded to the SFHRC letter, refusing to answer Monger's request

3    for a reasonable accommodation during the remainder of his time at IEC.  Instead, IEC began

4    crafting its work schedule each week to deprive Monger of substantial work hours and deny

5    Monger the reasonable accommodations he had requested.  By doing so, IEC repeatedly refused

6    Monger's requests.

7        146.    As discussed above, IEC employees' work schedules are not fixed from week to

8    week.  Instead, IEC draws up a new and separate schedule each week, and a given employee's

9    working hours and responsibilities are liable to vary from week to week, depending on the work

10    IEC has to offer during that week.  Accordingly, an employee who during a given week is given

11    a particular work assignment, or scheduled for a certain number of hours, may receive a different

12    type or amount of work in subsequent weeks.  Similarly, an employee who during a given week

13    is denied assignments, or whose hours are cut, may be given additional or more desirable

14    assignments, or an increase in hours, in future weeks.

15        147.    Accordingly, each weekly work schedule created and distributed by IEC from the

16    date on which Monger was able to return to work—September 15, 2006—through the date IEC

17    terminated him—February 2, 2007—was a separate and independent instance of IEC's denial of

18    a reasonable accommodation requested by Monger.

19        148.    As a direct and proximate result of IEC's failure to provide reasonable

20    accommodations, Monger has suffered harm including, but not limited to, loss of income and

21    emotional distress.

22        149.    IEC's unlawful conduct was committed by Rouchdy and Martinez, officers and

23    managerial employees acting within the scope of their employment.

24        150.    IEC, Rouchdy, and Martinez intentionally violated the ADA, acting with malice

25    and/or a reckless disregard for Monger's rights.

26    ///

27    ///

28    ///

COMPLAINT
CASE NO.

1

## SIXTH CLAIM FOR RELIEF

2

### Failure to Provide Reasonable Accommodation under FEHA (Against IEC)

3      151.     Monger incorporates the preceding paragraphs by reference as though fully set

4    forth here.

5      152.     As discussed above, at all times during Monger's Employment Period with IEC,

6    IEC was an employer subject to the California Fair Employment and Housing Act ("FEHA"),

7    and Monger was an employee of IEC.

8      153.     As described in greater detail above, throughout the Employment Period, Monger

9    had AIDS, which is expressly recognized under FEHA as a qualifying disability per se.

10      154.     As described in greater detail above, both Rouchdy and Martinez knew Monger

11    was disabled and treated Monger as a disabled person during the Employment Period.

12      155.     Monger was able to perform all essential duties of his job at IEC with reasonable

13    accommodations to his work schedule.

14      156.     When Monger returned from his elbow surgery in September 2006, Monger asked

15    that IEC permit him to return to work with certain specified reasonable accommodations.

16    Monger caused the SFHRC to submit a formal letter to IEC asserting his legal rights and setting

17    forth specific requested reasonable accommodations.  Monger informed IEC that the

18    accommodations he requested were necessary because of his disability.  Similarly, the schedule

19    adjustments Monger requested were reasonable and would not affect his ability to fulfill the

20    essential duties of his position or interfere with IEC's business.  IEC allowed other, non-disabled

21    employees many of the reasonable accommodations Monger had requested, including flexible

22    work schedules and/or the right to work from home.

23      157.     IEC never responded to the SFHRC letter, refusing to answer Monger's request

24    for a reasonable accommodation during the remainder of his time at IEC.  Instead, IEC began

25    crafting its work schedule each week to deprive Monger of substantial work hours and deny

26    Monger the reasonable accommodations he had requested.  By doing so, IEC repeatedly refused

27    Monger's requests.

28    ///

158.    As discussed above, IEC employees' work schedules are not fixed from week to week. Instead, IEC draws up a new and separate schedule each week, and a given employee's working hours and responsibilities are liable to vary from week to week, depending on the work IEC has to offer during that week. Accordingly, an employee who during a given week is given a particular work assignment, or scheduled for a certain number of hours, may receive a different type or amount of work in subsequent weeks. Similarly, an employee who during a given week is denied assignments, or whose hours are cut, may be given additional or more desirable assignments, or an increase in hours, in future weeks.

159.    Accordingly, each weekly work schedule created and distributed by IEC from the date on which Monger was able to return to work—September 15, 2006—through the date IEC terminated him—February 2, 2007—was a separate and independent instance of IEC's refusal to allow Monger to return to work with his requested reasonable accommodations.

160.    Moreover, IEC's pattern of denying Monger the reasonable accommodations he had requested constituted a continuing violation of his rights under FEHA. Monger first informed IEC that he required reasonable accommodations in January 2006, at his initial interview with Rouchdy. Rouchdy agreed that IEC would reasonably accommodate Monger by permitting him to begin work at 8:30 a.m. rather than 8:00 a.m. IEC began refusing Monger's requested reasonable accommodations in March 2006, when Martinez rescinded Rouchdy's reasonable accommodation and insisted that Monger begin coming to work at 8:00 a.m. Martinez also forbade Monger from leaving work to see his doctors, although Rouchdy later overruled Martinez on that point. In May 2006, when Monger formally requested that IEC obey the law and reinstate the original reasonable accommodation Rouchdy had granted him in January 2006, Martinez refused, requiring Monger to be at work at 8:00 a.m. on days when he needed to take time off for medical appointments. Because Monger averaged four doctor's appointments per week, Martinez's ruling forced him to arrive at work each day at 8:00 a.m., and further had the effect of discouraging Monger from seeing his doctors. As a result, Monger began missing important doctor's appointments to avoid causing problems at work. In June 2006, Rouchdy informed Monger that he would no longer discuss potential reasonable

1    accommodations with him, and that Monger had to deal exclusively with Martinez, who had

2    consistently refused to provide such accommodations and had, in the past, attempted to prevent

3    him from leaving work at any time for medical appointments.  In the following months, IEC's

4    consistent refusals to provide requested reasonable accommodations continued through

5    Monger's ongoing dialogue with Martinez regarding his work hours and doctor's appointments,

6    and Martinez's denial of breaks and harassment of Monger for his bathroom usage.  In August

7    2006, Martinez again decreed that Monger could no longer take any time off for medical

8    appointments, at which point Monger again asserted his legal rights.  Martinez then barred him

9    from returning to work after his surgery until he had recovered full use of his arm, even though

10   IEC had ample work not requiring Monger to use both arms.  In response to that, in September

11   2006, Monger again asserted his legal rights to specific reasonable accommodations, this time by

12   submitting a letter through SFHRC.  Martinez never responded to Monger's request or the

13   SFHRC letter, denying Monger any accommodation and instead beginning to craft each weekly

14   IEC work schedule to deny Monger hours, before eventually terminating him in February 2007.

15           161.    IEC's refusals to provide reasonable accommodations to Monger from May 2006

16   through February 2007 were all interrelated and similar in nature; they each involved Monger's

17   work schedule and right to take time off for medical appointments.  The retaliatory acts occurred

18   regularly and frequently, and together formed an ongoing course of retaliatory conduct towards

19   Monger.  Further, because IEC had frequently changed its position on Monger's work hours and

20   right to see his doctors during work hours, either in response to Monger's assertion of his rights,

21   Rouchdy's intervention with Martinez, or Martinez changing her own mind, a reasonable person

22   in Monger's position would not have believed that any of IEC's adverse actions were final.

23   Indeed, Monger continued to negotiate each issue with IEC until IEC terminated him,

24   recognizing that IEC could still alter its illegal practices, as it had altered its position before.

25           162.    Monger requested that IEC adjust his work schedule and/or allow him to complete

26   some work from off-site to accommodate his disability, including the side effects of his AIDS

27   medications and his required regular doctor visits.

28   ///

163.    Monger informed IEC that the accommodations he requested were necessary because of his disability.

164.    IEC repeatedly refused Monger's requests for accommodations.

165.    The schedule adjustments Monger requested were reasonable and would not affect his ability to fulfill the essential duties of his position or interfere with IEC's business.

166.    IEC allowed other, non-disabled employees to have flexible work schedules and/or to work from home.

167.    As a direct and proximate result of IEC's failure to provide reasonable accommodations, Monger has suffered harm including, but not limited to, loss of income and emotional distress.

168.    IEC's unlawful conduct was committed by Rouchdy and Martinez, who are both IEC officers and managing agents.  Rouchdy endorsed, approved, and/or ratified Martinez's unlawful conduct toward Monger.

169.    IEC's conduct was despicable and in willful and conscious disregard of Monger's rights, and IEC acted toward Monger with malice, oppression, and fraud.

### SEVENTH CLAIM FOR RELIEF

**Failure to Engage in Good-Faith Interactive Process Regarding Reasonable**

**Accommodations under the ADA (Against IEC)**

170.    Monger incorporates the preceding paragraphs by reference as though fully set forth here.

171.    As discussed above, at all times during Monger's Employment Period with IEC, IEC was an employer subject to ADA, and Monger was an employee of IEC.

172.    As described in greater detail above, throughout the Employment Period, Monger had AIDS, which substantially limited him in his ability to perform multiple major life activities.

173.    As described in greater detail above, both Rouchdy and Martinez knew Monger was disabled and treated Monger as a disabled person during the Employment Period.

174.    Monger was able to perform all essential duties of his job at IEC with reasonable accommodations to his work schedule.

421550.04

175.    When Monger returned from his elbow surgery in September 2006, Monger asked that IEC permit him to return to work with certain specified reasonable accommodations. Monger caused the SFHRC to submit a formal letter to IEC asserting his legal rights and setting forth specific requested reasonable accommodations.  Monger informed IEC that the accommodations he requested were necessary because of his disability.  Similarly, the schedule adjustments Monger requested were reasonable and would not affect his ability to fulfill the essential duties of his position or interfere with IEC's business.  IEC allowed other, non-disabled employees many of the reasonable accommodations Monger had requested, including flexible work schedules and/or the right to work from home.

176.    IEC never responded to the SFHRC letter, refusing to answer Monger's request for a reasonable accommodation during the remainder of his time at IEC.  Instead, IEC began crafting its work schedule each week to deprive Monger of substantial work hours and deny Monger the reasonable accommodations he had requested.  By doing so, IEC repeatedly refused Monger's requests for a reasonable accommodation and failed to engage in a good-faith interactive process with Monger to determine effective reasonable accommodations for Monger's disability.

177.    As a direct and proximate result of IEC's failure to engage in a good-faith interactive process regarding reasonable accommodations for Monger's disability, Monger has suffered harm including, but not limited to, loss of income and emotional distress.

178.    IEC's unlawful conduct was committed by Rouchdy and Martinez, officers and managerial employees acting within the scope of their employment.

179.    IEC, Rouchdy, and Martinez intentionally violated the ADA, acting with malice and/or a reckless disregard for Monger's rights.

## EIGHTH CLAIM FOR RELIEF

### Failure to Engage in Good-Faith Interactive Process Regarding Reasonable Accommodations under FEHA (Against IEC)

180.    Monger incorporates the preceding paragraphs by reference as though fully set forth here.

COMPLAINT
CASE NO.

421550.04

181. As discussed above, at all times during Monger's Employment Period with IEC, IEC was an employer subject to the California Fair Employment and Housing Act ("FEHA"), and Monger was an employee of IEC.

182. As described in greater detail above, throughout the Employment Period, Monger had AIDS, which is expressly recognized under FEHA as a qualifying disability per se.

183. As described in greater detail above, both Rouchdy and Martinez knew Monger was disabled and treated Monger as a disabled person during the Employment Period.

184. Monger was able to perform all essential duties of his job at IEC with reasonable accommodations to his work schedule.

185. When Monger returned from his elbow surgery in September 2006, Monger asked that IEC permit him to return to work with certain specified reasonable accommodations. Monger caused the SFHRC to submit a formal letter to IEC asserting his legal rights and setting forth specific requested reasonable accommodations. Monger informed IEC that the accommodations he requested were necessary because of his disability. Similarly, the schedule adjustments Monger requested were reasonable and would not affect his ability to fulfill the essential duties of his position or interfere with IEC's business. IEC allowed other, non-disabled employees numerous of the reasonable accommodations Monger had requested, including flexible work schedules and/or the right to work from home.

186. IEC never responded to the SFHRC letter, refusing to answer Monger's request for a reasonable accommodation during the remainder of his time at IEC. Instead, IEC began crafting its work schedule each week to deprive Monger of substantial work hours and deny Monger the reasonable accommodations he had requested. By doing so, IEC repeatedly refused Monger's requests for a reasonable accommodation and failed to engage in a good-faith interactive process with Monger to determine effective reasonable accommodations for Monger's disability.

187. Moreover, IEC's pattern of refusing to engage Monger in a good-faith interactive process to determine effective reasonable accommodations for Monger's disability constituted a continuing violation of his rights under FEHA. Monger first informed IEC that he required

1    reasonable accommodations in January 2006, at his initial interview with Rouchdy.  Rouchdy

2    agreed that IEC would reasonably accommodate Monger by permitting him to begin work at

3    8:30 a.m. rather than 8:00 a.m.  IEC began refusing Monger's requested reasonable

4    accommodations in March 2006, when Martinez rescinded Rouchdy's reasonable

5    accommodation and insisted that Monger begin coming to work at 8:00 a.m.  Martinez also

6    forbade Monger from leaving work to see his doctors, although Rouchdy later overruled

7    Martinez on that point.  In May 2006, when Monger formally requested that IEC obey the law

8    and reinstate the original reasonable accommodation Rouchdy had granted him in January 2006,

9    Martinez refused, requiring Monger to be at work at 8:00 a.m. on days when he needed to take

10   time off for medical appointments.  Because Monger averaged four doctor's appointments every

11   week, Martinez's ruling forced him to arrive at work each day at 8:00 a.m., and further had the

12   effect of discouraging Monger from seeing his doctors.  As a result, Monger began missing

13   important doctor's appointments to avoid causing problems at work.  IEC's consistent refusals to

14   engage in a good-faith interactive process continued through Monger's ongoing dialogue with

15   Martinez regarding his work hours and doctor's appointments, and Martinez's denial of breaks

16   and harassment of Monger for his bathroom usage.  In June 2006, Rouchdy further displayed

17   IEC's hostility to a good-faith interactive process by informing Monger that Monger could no

18   longer bring requests to Rouchdy, but instead would have to deal solely with Martinez, who had

19   consistently behaved unreasonably and was the source of Monger's problems at IEC.  In August

20   2006, Martinez again decreed that Monger could no longer take any time off for medical

21   appointments, at which point Monger again asserted his legal rights.  Rather than engaging in a

22   good-faith interactive process at that point, Martinez barred him from returning to work after his

23   surgery until he had recovered full use of his arm, even though IEC had ample work not

24   requiring Monger to use both arms.  In response to that, in September 2006, Monger yet again

25   asserted his legal rights to specific reasonable accommodations, this time through SFHRC.

26   Martinez never responded to Monger's request or the SFHRC letter, denying Monger any

27   accommodation and instead beginning to craft each weekly IEC work schedule to deny Monger

28   hours, before eventually terminating him in February 2007.

188.    From May 2006 through February 2007, IEC's failure to engage in a good-faith interactive process regarding a reasonable accommodation of Monger's disability was an ongoing course of unlawful conduct towards Monger, including both IEC's affirmative refusals to engage in that process at Monger's request and its silent failure to do so at any other time. Each refusal to engage in good faith involved Monger's work schedule and right to take time off for medical appointments, and related wrongful acts occurred regularly and frequently. Further, because IEC had frequently changed its position on accommodating Monger's disability through altering his work schedule and permitting him to see his doctors during work hours, either in response to Monger's assertion of his rights, Rouchdy's intervention with Martinez, or Martinez changing her own mind, a reasonable person would not have believed that any of these adverse actions were final. Indeed, Monger continued to negotiate each issue with IEC until IEC terminated him, recognizing that IEC could still alter its illegal practices, as it had altered its position before.

189.    As a direct and proximate result of IEC's failure to engage in a good-faith interactive process regarding reasonable accommodations for Monger's disability, Monger has suffered harm including, but not limited to, loss of income and emotional distress.

190.    IEC's unlawful conduct was committed by Rouchdy and Martinez, who are both IEC officers and managing agents. Rouchdy endorsed, approved, and/or ratified Martinez's unlawful conduct toward Monger.

191.    IEC's conduct was despicable and in willful and conscious disregard of Monger's rights, and IEC acted toward Monger with malice, oppression, and fraud.

## NINTH CLAIM FOR RELIEF

### Wrongful Adverse Employment Actions in Violation of Public Policy (Against IEC)

192.    Monger incorporates the preceding paragraphs by reference as though fully set forth here.

193.    As the California courts repeatedly have recognized, California has a fundamental and substantial public policy of protecting employees from adverse employment actions made because of disability discrimination or in retaliation for complaints about discrimination or

40

1  failure to provide reasonable accommodations.

2      194.   As described above, Monger has a qualifying physical disability under California

3  law, IEC perceived him as disabled, and Monger attempted to exercise his rights to reasonable

4  accommodations and non-discriminatory treatment on the job.

5      195.   IEC consistently mistreated Monger because of his disability and his attempts to

6  enforce his rights under federal and state law. Most obviously, when Monger returned to work

7  after his elbow surgery in September 2006, and submitted a complaint from SFHRC asserting his

8  right to work with certain specified reasonable accommodations, IEC responded by repeatedly

9  scheduling Monger for only minimal hours throughout the fall and winter of 2006 and 2007, as

10  opposed to his previous full-time schedule. IEC cut Monger's work hours even though it had

11  enough work to permit Monger to work full-time and Monger was an outstanding employee who

12  had repeatedly received commendations from IEC supervisors and clients. IEC then completed

13  its retaliation campaign by terminating Monger's employment on February 2, 2007.

14      196.   Monger's disability and/or his attempts to exercise his rights to non-

15  discriminatory treatment and reasonable accommodations were a motivating reason for IEC's

16  adverse employment actions and termination of Monger.

17      197.   IEC's stated reasons for reducing Monger's work hours and for terminating him

18  were false and pretextual. Monger discovered that IEC's stated reason for limiting his work

19  hours and then terminating him—the absence of interpretation work—was false only in March

20  2008, when he learned that IEC had regained the Contra Costa County hospital contract and the

21  associated interpretation work. In any event, IEC easily could have transitioned him to written

22  translation work, which Monger was qualified to perform and had been performing during his

23  time at IEC. IEC had sufficient available translation work to retain Monger as an employee.

24      198.   As a direct and proximate result of IEC's adverse employment actions and

25  termination, Monger has suffered harm including, but not limited to, loss of income and

26  emotional distress.

27      199.   IEC's unlawful conduct was committed by Rouchdy and Martinez, who are both

28  IEC officers and managing agents. Rouchdy endorsed, approved, and/or ratified Martinez's

1  unlawful conduct toward Monger.

2      200.   IEC's conduct was despicable and in willful and conscious disregard of Monger's

3  rights, and IEC acted toward Monger with malice, oppression, and fraud.

4                      **TENTH CLAIM FOR RELIEF**

5  **Non-payment of Wages and Overtime Wages in Violation of Fair Labor Standards Act**

6                      **(Against All Defendants)**

7      201.   Monger incorporates the preceding paragraphs by reference as though fully set

8  forth here.

9      202.   During Monger's Employment Period, IEC was an employer within the meaning

10  of the FLSA, 29 U.S.C. § 201 *et seq.*

11      203.   Upon information and belief, both Rouchdy and Martinez exercised operational

12  control of IEC during the Employment Period, including determining the payment and

13  nonpayment of wages.

14      204.   During the Employment Period, Monger was an employee of IEC who performed

15  work for IEC.  Throughout his time at IEC, Monger periodically worked overtime hours.

16      205.   IEC failed to pay Monger in a timely manner for all of the hours he worked.  IEC

17  also failed to pay Monger proper overtime wages, namely 1 1/2 times his regular hourly wage,

18  for all of the overtime hours he worked under the FLSA.

19      206.   Monger's employment ended on February 2, 2007.

20      207.   As of today, IEC still has not paid Monger his full wages owed for his work at

21  IEC, including overtime wages.

22      208.   IEC's failure to pay wages was not in subjective and objective good faith, and

23  Monger is entitled to liquidated damages equal to all delayed and unpaid wages.

24                      **ELEVENTH CLAIM FOR RELIEF**

25          **Non-payment of Wages and Overtime Wages (Against IEC)**

26      209.   Monger incorporates the preceding paragraphs by reference as though fully set

27  forth here.

28  ///

210.    During the Employment Period, Monger was an employee of IEC who performed work for IEC.  Throughout his time at IEC, Monger periodically worked overtime hours.

211.    IEC failed to pay Monger in a timely manner for all of the hours he worked.  IEC also failed to pay Monger proper overtime wages, namely 1 1/2 times his regular hourly wage, for all of the overtime hours he worked under California law.

212.    Monger's employment ended on February 2, 2007.

213.    IEC failed to pay Monger all of his wages owed on the day of his termination.  As of today, IEC still has not paid Monger his full wages owed, including overtime wages.

## TWELFTH CLAIM FOR RELIEF

### Denial of Rest and Meal Breaks (Against IEC)

214.    Monger incorporates the preceding paragraphs by reference as though fully set forth here.

215.    Throughout Monger's employment at IEC, IEC refused to permit Monger to take and/or discouraged Monger from taking rest and meal breaks to which he was entitled under California law.

216.    Monger is entitled to payment of the meal and rest period premiums provided by California law for IEC's violations of his rights to meal and rest periods.

217.    IEC has not paid Monger any meal or rest period premiums.

## THIRTEENTH CLAIM FOR RELIEF

### Waiting Time Penalties under the California Labor Code (Against IEC)

218.    Monger incorporates the preceding paragraphs by reference as though fully set forth here.

219.    IEC terminated Monger's employment with the company on February 2, 2007.

220.    IEC failed to pay Monger his full wages owed (including regular wages, overtime wages, and meal and rest break premiums) immediately upon his termination.

221.    As of today, IEC still has not paid Monger his full wages owed.

222.    IEC's failure to pay Monger's full wages has been willful and not in good faith.

///

## FOURTEENTH CLAIM FOR RELIEF

### Failure to Provide Accurate Itemized Wage Statements (Against IEC)

223.    Monger incorporates the preceding paragraphs by reference as though fully set forth here.

224.    California Labor Code § 226(a) requires employer to provide itemized wage statements at the time of each payment of wages indicating, among other things, all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each.

225.    IEC failed to provide Monger with adequate itemized wage statements complying with section 226.  For example, even when IEC provided Monger with an official wage statement—which it did only for his work on or after July 27, 2006—IEC's wage statements do not include overtime pay rates or identify overtime hours.

226.    IEC's failure to provide adequate wage statements was knowing and intentional.

227.    IEC's failure to provide adequate wage statements harmed Monger, including but not limited to by preventing him from knowing the true amount of wages IEC owed to him.

228.    Monger is entitled to recover the greater of his actual damages from IEC's failure to provide adequate wage statements or a penalty of $50 for the initial pay period in which a violation occurred and $100 per employee for each violation in a subsequent pay period (up to a maximum of $4,000), in addition to attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Monger prays that this Court enter judgment in his favor and grant the following relief against all the defendants and each of them jointly and severally (for those claims brought against more than one defendant):

1.    Compensatory and general damages in an amount to be determined according to proof, and including but not limited to lost wages and emotional distress damages;

2.    Back pay and front pay in an amount to be determined according to proof;

3.    All forms of penalty wages, liquidated damages, or any other statutory penalties permitted by law;

1    4.    Punitive and exemplary damages in an amount to be determined at trial;

2    5.    Permanent injunctive relief prohibiting defendants from engaging in similar future

3    discriminatory, retaliatory, or otherwise unlawful practices towards employees with actual or

4    perceived disabilities;

5    6.    Costs, expenses, and reasonable attorneys' fees in an amount to be determined

6    according proof;

7    7.    Interest at the maximum legal rate on all monetary awards, including prejudgment

8    interest to the full extent permissible by law; and

9    8.    All other forms of legal or equitable relief that the Court deems just and proper.

10                                    **JURY DEMAND**

11    Monger hereby demands a jury trial for all issues so triable.

12

13    Dated:  August 28, 2008                          KEKER & VAN NEST, LLP

14

15

16                                    By: _____
                                          DANIEL PURCELL
17                                        Attorneys for Plaintiff
                                          MARLON MONGER
18

19

20

21

22

23

24

25

26

27

28

45
COMPLAINT
CASE NO.

**EXHIBIT A**

# * * * EMPLOYMENT * * *

| | |
|---|---|
| **COMPLAINT OF DISCRIMINATION UNDER THE PROVISIONS OF THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT** | DFEH #  E200708 A-0430-00-mpre |
| | EEOC #  37AA804043 |

If dealt filed with EEOC, this form may be affected by the Privacy Act of 1974.

## CALIFORNIA DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING and EEOC

COMPLAINANT'S NAME (indicate Mr. or Ms.)
(Mr.) Marlon Monger

| ADDRESS 462 Duboce Avenue | | | | TELEPHONE NUMBER (INCLUDE AREA CODE) (415) 279-1482 |
|---|---|---|---|---|
| CITY San Francisco | STATE CA | ZIP 94117 | COUNTY San Francisco | COUNTY CODE 075 |

NAMED IS THE EMPLOYER, PERSON, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, OR STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME:

NAME
International Effectiveness Center

| ADDRESS 360 Pine Street, Third Floor | | | | TELEPHONE NUMBER (INCLUDE AREA CODE) (800) 292-9246 |
|---|---|---|---|---|
| CITY San Francisco | STATE CA | ZIP 94104 | COUNTY San Francisco | COUNTY CODE 075 |

CAUSE OF DISCRIMINATION BASED ON (CHECK APPROPRIATE BOX(ES))
☐ RACE  ☐ SEX  ☑ DISABILITY  ☐ RELIGION  ☐ NATIONAL ORIGIN/ANCESTRY  ☐ DENIAL OF FAMILY/MEDICAL LEAVE  ☐ SEXUAL ORIENTATION
☐ COLOR  ☐ AGE  ☐ MARITAL STATUS  ☐ MEDICAL CONDITION (cancer or genetic characteristics)  ☐ OTHER (SPECIFY)

| NO. OF EMPLOYEES/MEMBERS 50 | DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (month, day, and year) February 2, 2007 | RESPONDENT CODE 073 |
|---|---|---|

THE PARTICULARS ARE:

I.  On or about February 2, 2007, I was denied a reasonable accommodation and terminated. In or about January, 2006, I was hired as an Interpreter. At the time of the termination, I was earning $20.00 per hour.

II.  Taryk Rouchdy, Supervisor, told me, "The low volume of telephone interpreting can no longer sustain an in-house employee."

III.  I believe I was denied a reasonable accommodation and terminated on the basis of my disability (AIDS). Also, I believe I was terminated in retaliation for opposing practices I believe to be unlawful under the California Fair Employment and Housing Act. My belief is based on the following:

A.  From January, 2006, through February 2, 2007, my employer was notified of my medical disability and request for a reasonable accommodation. In May, 2006, my request to adjust my hours to report to work at 8:30 a.m. due to side effects of my prescribed medications was denied. In or about August, 2006, my employer was notified of my elbow surgery. I was denied time off for doctors' appointments and I reported a complaint of discrimination.

B.  In or about September, 2006, after returning to work from medical treatment, my employer stopped my job assignments at Children's Hospital.

C.  On September 14, 2006, I was released to return to work with restrictions not to use my right hand. Although my physician indicated that I can continue performing interpreter duties, my reasonable accommodation was denied and my work hours were reduced from approximately 40 hours per week to four (4) to six (6) hours per week.

D.  From September 13, 2006 to February 7, 2007, my employer continued to deny me a reasonable accommodation and I continued to report that I believed the decision was discrimination.

C.  On February 7, 2007, I was terminated. I believe my disability was a factor used in the decision to deny me a reasonable accommodation, job transfer and terminate me, which is a violation of the Fair Employment and Housing Act.

Typed September 19, 2007, October 23, 2007

☑ I also want this charge filed with the Federal Equal Employment Opportunity Commission (EEOC).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct of my own knowledge except as to matters stated on my information and belief, and as to those matters I believe it to be true.

Dated  10/25/07

At  San Francisco, CA
     City

COMPLAINANT'S SIGNATURE

DFEH-300-01 (12/99)    SF:ts
DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING

DATE FILED:  October 29, 2007

RECEIVED
OCT 29 2007
BY: SAN FRANCISCO STATE OF CALIFORNIA

**EXHIBIT  B**

STATE OF CALIFORNIA - STATE AND CONSUMER SERVICES AGENCY                                                      ARNOLD SCHWARZENEGGER, Governor

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**
1515 Clay Street, Suite 701, Oakland, CA 94612
(510) 622-2973 TTY (800) 700-2320 Fax (510) 622-2952
www.dfeh.ca.gov



October 31, 2007


MARLON MONGER
462 Duboce Avenue
San Francisco, CA 94117

RE:    E200708A0430-00-mpre/37AA804043
       MONGER/INTERNATIONAL EFFECTIVENESS CENTER

Dear MARLON MONGER:

### NOTICE OF CASE CLOSURE

The consultant assigned to handle the above-referenced discrimination complaint that was filed with the Department of Fair Employment and Housing (DFEH) has recommended that the case be closed on the basis of: Processing Waived To Another Agency.

Please be advised that this recommendation has been accepted and the case has been closed effective October 31, 2007.

This letter is also your Right-To-Sue Notice.  According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. This is also applicable to DFEH complaints that are filed under, and allege a violation of Government Code section 12948 which incorporates Civil Code sections 51, 51.7, and 54.  The civil action must be filed within one year from the date of this letter.  However, if your civil complaint alleges a violation of Civil Code section 51, 51.7, or 54, you should consult an attorney about the applicable statutes of limitation.  If a settlement agreement has been signed resolving the complaint, it is likely that your right to file a private lawsuit may have been waived.

Notice of Case Closure
Page Two


This case may be referred to the U.S. Equal Employment Opportunity Commission (EEOC) for further review. If so, pursuant to Government Code section 12965, subdivision (d)(1), your right to sue will be tolled during the pendency of EEOC's review of your complaint.

DFEH does not retain case files beyond three years after a complaint is filed, unless the case is still open at the end of the three-year period.

Sincerely,


Herbert Yarbrough
District Administrator


cc:    Case File


Taryk Rouchdy
Supervisor
INTERNATIONAL EFFECTIVENESS CENTER
360 Pine St., Third Floor
San Francisco, CA 94104

DFEH-200-08e (06/06)
ASMITHT

**EXHIBIT  C**

EEOC Form 161-B (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | Marlon Monger | From: | San Francisco District Office |
|---|---|---|---|
| | c/o Alyse D. Bertenthal | | 350 The Embarcadero |
| | Law Offices of Keker & Van Nest LLP | | Suite 500 |
| | 710 Sansome Street | | San Francisco, CA 94105 |
| | San Francisco, CA 94111-1704 | | |

☐   *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 37A-2008-04043 | **Hannah Lai,** <br> **Investigator** | **(415) 625-5664** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u>** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

☒   More than 180 days have passed since the filing of this charge.

☐   Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒   The EEOC is terminating its processing of this charge.

☐   The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐   The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u>** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐   The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u>** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Michael Baldonado*     8/20/08

Enclosures(s)             **Michael Baldonado,**      *(Date Mailed)* <br>                                **Acting Director**

cc:      **Interntaional Effectiveness Center** <br>         **c/o Michele Ballard Miller** <br>         **Miller Law Group** <br>         **500 Sansome Street, Suite 400** <br>         **San Francisco, CA 94111**

Enclosure with EEOC
Form 161-B (3/98)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

PRIVATE SUIT RIGHTS     --     **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),
or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within
90 days of the date you *receive* this Notice**.  Therefore, you should **keep a record of this date**.  Once this 90-
day period is over, your right to sue based on the charge referred to in this Notice will be lost.  If you intend to
consult an attorney, you should do so promptly.  Give your attorney a copy of this Notice, and its envelope, and tell
him or her the date you received it.  Furthermore, in order to avoid any question that you did not act in a timely
manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as
indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.  (Usually, the appropriate
State court is the general civil trial court.)  Whether you file in Federal or State court is a matter for you to decide
after talking to your attorney.  Filing this Notice is not enough.  You must file a "complaint" that contains a short
statement of the facts of your case which shows that you are entitled to relief.  Your suit may include any matter
alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in
the charge.  Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some
cases can be brought where relevant employment records are kept, where the employment would have been, or
where the respondent has its main office.  If you have simple questions, you usually can get answers from the
office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or
make legal strategy decisions for you.

PRIVATE SUIT RIGHTS     --     **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back
pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible.  For
example, if you were underpaid under the EPA for work performed from 7/1/00 to 12/1/00, you should file suit
before 7/1/02 – *not* 12/1/02 -- in order to recover unpaid wages due for July 2000.  This time limit for filing an EPA
suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above.  Therefore, if
you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed
within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

ATTORNEY REPRESENTATION     --     **Title VII and the ADA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction
in your case may, in limited circumstances, assist you in obtaining a lawyer.  Requests for such assistance must be
made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your
efforts to retain an attorney).  Requests should be made well before the end of the 90-day period mentioned above,
because such requests do not relieve you of the requirement to bring suit within 90 days.

ATTORNEY REFERRAL AND EEOC ASSISTANCE     --     **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any
questions about your legal rights, including advice on which U.S. District Court can hear your case.  If you need to
inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide
your charge number (as shown on your Notice).  While EEOC destroys charge files after a certain time, all charge files
are kept for at least 6 months after our last action on the case.  Therefore, if you file suit and want to review the charge
file, **please make your review request within 6 months of this Notice.**  (Before filing suit, any request should be
made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*